**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                                    **FOR PUBLICATION**

            MANOLO BLAHNIK USA, LTD.,                          Chapter 7

                                          Case No. 20-11102 (MG)

                          Alleged Debtor.
------------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER DENYING ALLEGED DEBTOR'S MOTION TO DISMISS THE INVOLUNTARY PETITION

*A P P E A R A N C E S:*

POLSINELLI PC
*Attorneys for Alleged Debtor*
600 Third Avenue, 42nd Floor
New York, New York, 10016
By:    Jason A. Nagi, Esq.
        Morgan C. Fiander, Esq.

DENTONS US LLP
*Attorneys for Petitioning Creditor*
1221 Avenue of the Americas
New York, New York 10020
By:    Robert A. Hammeke, Esq.
        Lauren Macksoud, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       This case involves a dispute arising from the distribution within the United States of very

expensive shoes—branded as Manolo Blahnik—manufactured in Italy and distributed to luxury

stores in many places across the globe. Pending before the Court is Manolo Blahnik USA, Ltd.'s

("Alleged Debtor") Motion to Dismiss the Involuntary Petition filed by Calzaturificio Re

Marcello S.R.L. ("Petitioning Creditor") pursuant to sections 303(b)(1) and 303(h) of the

Bankruptcy Code. ("Motion," ECF Doc. # 14.) The Alleged Debtor was the exclusive

distributor of Manolo Blahnik shoes in the United States before its license was not renewed in 2019. The Motion is supported by a memorandum of law ("MOL," ECF Doc. # 11) and the declaration of Denny Rodriguez ("Rodriguez Declaration," ECF Doc. # 12), the Alleged Debtor's Comptroller. On July 17, 2020, Petitioning Creditor filed a memorandum of law in opposition to the Motion. ("Response," ECF Doc. # 17.) The Response is supported by the declarations of: (1) Georgina McManus, the Global General Counsel of Petitioning Creditor's parent company ("McManus Declaration," ECF Doc. # 18); (2) Andrew Wright, the Chief Commercial Officer of Petitioning Creditor's parent company ("Wright Declaration," ECF Doc. # 19); and (3) Cardile Antonia, the Petitioning Creditor's Chief Administrative Officer ("Antonia Declaration," ECF Doc. # 20). On July 21, 2020, the Alleged Debtor filed a reply. ("Reply," ECF Doc. # 21.) On July 23, 2020, the Petitioning Creditor filed a sur-reply. ("Sur-Reply," ECF Doc. # 22.) The Sur-Reply is supported by a second declaration of Georgia McManus ("Second McManus Declaration," ECF Doc. # 23) and a second declaration of Andrew Wright ("Second Wright Declaration," ECF Doc. # 24). On July 24, 2020 the Alleged Debtor filed a supplemental declaration of Denny Rodriguez. ("Second Rodriguez Declaration," ECF Doc. # 25.) On July 24, 2020, the Court held a hearing (the "Hearing") on the Alleged Debtor's Motion and took the Motion under submission.

An involuntary petition filed by a single creditor must be dismissed if there is a bona fide dispute of either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts. The Petitioning Creditor's claims in this case arise from two unpaid invoices totaling €949,567.00, arising from two separate transactions in 2019, each billed separately to the Alleged Debtor for the purchase of Manolo Blahnik branded shoes. The Motion and declarations underscore that, objectively

viewed, there are disputed issues of material fact relating only to the second unpaid invoice in the amount of €403,181.10.  There are no disputed issues of fact or law arising from the first unpaid invoice.

The Court holds below that the portion of the Petitioning Creditor's claim in the amount of "*at least*" $601,447.60 or €546,386.00[1] arising from the first unpaid invoice was a separate transaction and is *not* "contingent as to liability or the subject of a bona fide dispute as to liability or amount."  11 U.S.C. § 303(b)(1).  The Petitioning Creditor's undisputed claim as to liability and amount for the first transaction makes it eligible to file the Involuntary Petition, even if the claim from the separate, second transaction is disputed as to liability or amount.

Therefore, the Alleged Debtor's Motion to Dismiss is **DENIED.**  The Alleged Debtor is ordered to answer the Involuntary Petition within 21 days from the entry of this Opinion and Order.  The answer must comply with Bankruptcy Rule 1003(b).[2]  Once the Alleged Debtor files its answer, the Court will hold a case management conference to determine whether a trial is necessary before entering an order for relief.  At the case management conference, the parties shall address whether they intend to take any discovery.

## I.    BACKGROUND

On May 4, 2020 (the "Petition Date"), the Petitioning Creditor filed an involuntary chapter 7 petition against the Alleged Debtor.  ("Involuntary Petition," ECF Doc. #1.)  The

---

[1]    The Involuntary Petition identifies the Petitioning Creditor's claim in both Dollars and Euros, but the Response only identifies the Petitioning Creditor's claim in Euros "since the parties discussed amounts owed in Euros."  (Response at 5 n.1.)  Accordingly, this Opinion will refer to the Petitioning Creditor's claim in Euros.

[2]    An issue remains about whether the Petitioning Creditor has met the statutory requirements of section 303(b) by bringing the Involuntary Petition alone.  Section 303(b)(1) requires that an involuntary filing be commenced by "three or more entities" who are undersecured in the amount of $16,750.  11 U.S.C. § 303(b)(1). Under section 303(b)(2), however, if the debtor has fewer than 12 eligible holders (not counting certain interested parties), an involuntary filing can be made by one or two qualifying creditors.  *See id.* § 303(b)(2).  If the Alleged Debtor's answer avers the existence of 12 or more creditors, the answer must list the information required by FED. R. BANKR. P. 1003(b) with respect to each claim.

Involuntary Petition alleges that the Alleged Debtor was generally not paying its debts as they became due.  (*See id.*)  The Involuntary Petition states the amount of the Petitioning Creditor's claim to be "*at least*" €546,386.00.  (*Id.*)  The facts, as set forth in the Motion and declarations submitted to this Court, are detailed below.

A.    **Manolo Blahnik Entities**

The Petitioning Creditor is an Italian private limited company that is 100% owned by Manolo Blahnik International, Lmtd. ("Parent").  (*Id.* at 5; MOL at 6.)  The Petitioning Creditor is a manufacturer of luxury products and manufactures Manolo Blahnik branded products. (McManus Declaration ¶ 4.)  In July 2019, Parent acquired the entire issued share capital of the Petitioning Creditor.  (*Id.*)  Parent designs, markets and sells luxury apparel, including luxury shoes and accessories under the Manolo Blahnik brand.  (Response at 7.)

The Alleged Debtor was previously the exclusive licensee to sell both women's and men's Manolo Blahnik shoes in the United States; in 2019, its license was not renewed. (Rodriguez Declaration ¶ 2.)  Parent then created a new entity, Manolo Blahnik Americas, LLC ("Affiliate"), to take over the Alleged Debtor's licensee rights and responsibilities on January 1, 2020.  *(Id.* ; Response at 10.)  On November 25, 2019, Parent and the Alleged Debtor entered into a "transition deed" (the "Transition Deed"), detailing the transition of licensing and responsibilities from Parent to Affiliate.  (MOL at 9; Response at 10.)  The Transition Deed provided that the Alleged Debtor would send a daily tally of inventory, and return all samples, drawings, and other Manolo Blahnik materials to Parent.  (MOL at 9.)  The Transition Deed also provided that calls and emails relating to new business in North America that had been previously directed to the Alleged Debtor should be directed to Andrew Wright ("Wright"), the Commercial Officer of Parent and President of Affiliate.  (MOL at 9; Response at 10.)  At the

4

Hearing, the two parties clarified that the Transition Deed provided that Affiliate would begin its licensing responsibilities on January 1, 2020, but that Affiliate's business relationship with Neiman Marcus could begin on the date of the Transition Deed. The Alleged Debtor stated that its business continues to operate for the purpose of collecting debts owed to it by other parties, specifically including Neiman Marcus. However, the Alleged Debtor is no longer distributing any products.

The Petitioning Creditor argues that it conducts its business independently of Parent and Affiliate through separate corporate structures and corporate financial records. (McManus Declaration ¶¶ 6, 8, 9.) The Petitioning Creditor's board of directors is different from Parent's and Affiliate's boards of directors, aside from one member, Ms. Eva Kristina Hulsebus, who sits on both boards. (Id. ¶¶ 4, 7.) The Second McManus Declaration provides that each entity is separately formed and maintained and separately capitalized. (Second McManus Declaration ¶ 6.) The Petitioning Creditor's funds and property are used solely for the benefit of Petitioning Creditor, and not for the benefit of Parent or Affiliate. (McManus Declaration ¶ 11.) Except for certain officer-level employees, the companies have separate employees. (Second McManus Declaration ¶ 6.) The companies do not share a website, and emails are sent from separate domains. (Id.) McManus represents that Parent purchases products from the Petitioning Creditor at arm's length terms that are profitable to both. (McManus Declaration ¶ 12.) The Petitioning Creditor and the Alleged Debtor conducted business directly when the Alleged Debtor wished to place an order. (Response at 7.)

By contrast, the Alleged Debtor maintains that the Petitioning Creditor and the Manolo Blahnik corporate family are jointly owned and controlled, supporting an agency relationship and alter ego liability. (Reply at 6–7.) The Alleged Debtor highlights that Parent is the parent

5

company of both Affiliate and the Petitioning Creditor.  (*Id.* at 6.)  McManus, Global General

Counsel to Parent, also provides legal support to Affiliate and the Petitioning Creditor and is a

member of the Board of Directors that manages the Petitioning Creditor.  (*Id.* at 6–7.)

McManus's email communications with Denny Rodriguez show that she acted on behalf of the

Petitioning Creditor by pressuring Alleged Debtor to pay the Petitioning Creditor.  (Rodriguez

Declaration ¶ 19, Ex. H; MOL at 21.)  The Alleged Debtor also points out that the various

companies in the Manolo Blahnik corporate family are all presented to the public as one unit and

use the same email domain and website.  (*See* Rodriguez Declaration, Exs. C–F; Reply at 6–7.)

    **B.**    **Petitioning Creditor's Unpaid Invoices and Two Neiman Marcus Purchase Orders**

        1.    The First Neiman Marcus Purchase Order

In June 2019, Neiman Marcus placed an order with the Alleged Debtor for a collection of

shoes.  (MOL at 7; Rodriguez Declaration ¶ 4.)  The Alleged Debtor subsequently placed the

order with the Petitioning Creditor, who shipped the collection to the Alleged Debtor between

October 15, 2019 and December 15, 2019.  (MOL at 7; Rodriguez Declaration ¶ 4.)  The Alleged

Debtor then shipped the collection to Neiman Marcus.  (MOL at 7; Rodriguez Declaration ¶ 4.)

On or about November 3, 2019, the Alleged Debtor issued Neiman Marcus a purchase order in

the amount of $721,893.00 for shoes to be shipped to Neiman Marcus around November through

December 2019 (the "First Neiman Marcus Purchase Order").  (MOL at 7; Rodriguez

Declaration ¶ 5.)  On January 9, 2020, after approved deductions, Neiman Marcus paid the

Alleged Debtor $601,741.90 for the First Neiman Marcus Purchase Order.  (MOL at 7;

Rodriguez Declaration ¶ 5.)

The Petitioning Creditor sent the Alleged Debtor invoices in November 2019 relating to

its manufacture of Manolo Blahnik branded shoes to fulfil the First Neiman Marcus Purchase

Order.  (Response at 7.)  The Alleged Debtor owes the Petitioning Creditor a total of

€546,282.00 for the November 2019 invoices.  (*Id.*; Antonia Declaration, Ex. A.)  The

Petitioning Creditor states that the November 2019 invoices have not been paid and are past-due

since February 29, 2020.  (Response at 7; Antonia Declaration ¶ 13.)  The Petitioning Creditor

also claims that the Alleged Debtor owes them €104.00 relating to a credit that the Alleged

Debtor improperly applied to a September 2019 invoice.  (Response at 7; Antonia Declaration ¶

14.)  The Antonia Declaration states that prior to this case being commenced, the Alleged Debtor

did not dispute that €546,386.00 is validly due and owing by the Alleged Debtor from the

September and November 2019 invoices.  (Antonia Declaration ¶ 21.)

### 2.    The Second Neiman Marcus Purchase Order

On or about December 19, 2019, the Alleged Debtor issued Neiman Marcus a purchase

order in the amount of $790,740.75 for shoes shipped to Neiman Marcus during the months of

October through December 2019 (the "Second Neiman Marcus Purchase Order").  (MOL at 7;

Rodriguez Declaration ¶ 6.)  At the Hearing, the Alleged Debtor indicated that Neiman Marcus

still has not paid Alleged Debtor for the Second Neiman Marcus Purchase Order.

The Petitioning Creditor sent the Alleged Debtor invoices in December 2019 relating to

its manufacture of Manolo Blahnik shoes to fulfil the Second Neiman Marcus Purchase Order.

(Response at 9.)  The Alleged Debtor owes Petitioning Creditor a total of €403,181.10 for the

December 2019 invoices.  (Response at 9; Antonia Declaration, Ex. B.)  The December 2019

invoices are past-due since March 31, 2020.  (Response at 9; Antonia Declaration, Exs. A–B.)

### 3.    The Past Due Invoices

The Petitioning Creditor asserts that the Alleged Debtor owes Petitioning Creditor a total

of €949,567.00.  (*Id.* at 7.)  That amount is larger than the amount of the Petitioning Creditor's

claim included in the Involuntary Petition, which lists the amount of the claim as €546,386.00.
(Involuntary Petition at 3.)  At the Hearing, counsel for the Petitioning Creditor said that the
Involuntary Petition only listed the amount due on the September and November 2019 invoices
because there was direct acknowledgement and communication regarding that amount in an
email between McManus and Denny Rodriguez.

According to the Petitioning Creditor, multiple attempts to secure payment from the
Alleged Debtor were unsuccessful.  (Response at 8.)  The Alleged Debtor argues that payment
on the past due amounts was not made because the amount in question is subject to a bona fide
dispute with the Petitioning Creditor.  (MOL at 6.)

### C.    Neiman Marcus' Non-Payment to the Alleged Debtor for the Second Neiman Marcus Purchase Order

On January 14, 2020, Neiman Marcus asked Affiliate to accept a return of 117 items of
men's stock for exchange.  (Response at 11.)  On January 15, 2020, Herin Rodriguez, an
Affiliate employee, authorized the requested exchange and provided a shipping address for the
return.  (*Id.*)  Despite Affiliate's instruction to ship the stock to that address, the Petitioning
Creditor states that Neiman Marcus mistakenly shipped this stock to the Alleged Debtor.  (*Id.*)
On January 28, 2020, the Alleged Debtor contacted Affiliate by email and advised that Neiman
Marcus mistakenly mailed this stock to the Alleged Debtor and that the Alleged Debtor had not
authorized the return of stock.  (*Id.*)  Denny Rodriguez was copied on this email.  (*Id.*)  On
January 28, 2020, Denny Rodriguez advised Neiman Marcus that they incorrectly shipped the
stock to the Alleged Debtor.  (*Id.*)  Affiliate made arrangements—in coordination with Alleged
Debtor—for this stock to be picked up from Alleged Debtor.  (*Id.*)  Affiliate received and
processed the exchanged stock.  On February 13, 2020, Affiliate internally credited $34,154.40
in favor of Neiman Marcus relating the exchanged items.  (*Id.*)

On February 14, 2020, Denny Rodriguez, the Alleged Debtor's Comptroller, sent an email to Neiman Marcus requesting payment of the Second Neiman Marcus Purchase Order that was more than thirty (30) days past due.  (Rodriguez Declaration, Ex. A at 8.)  On February 24, 2020, Neiman Marcus informed the Alleged Debtor that the payment was on hold due to a dispute over a $38,000.00 credit for men's shoes (the "Unknown Dispute") that were returned to the Alleged Debtor with Wright's approval.  (*Id.* at 6–7.)  The Alleged Debtor states that Wright has never been affiliated with the Alleged Debtor and had no authority to act on the Alleged Debtor's behalf.  (Rodriguez Declaration ¶ 8.)  According to the Alleged Debtor, it was common practice for Neiman Marcus to withhold full payment on a purchase order if there were any irregularities, issues or disputed credits of any amount owed with respect to a purchase order.  (MOL at 8.)  Denny Rodriguez informed Neiman Marcus that Neiman Marcus credited the amount to Affiliate, rather than the Alleged Debtor.  (Rodriguez Declaration, Ex. A at 6.)  On March 6, 2020, Neiman Marcus responded to Denny Rodriguez, authorizing payment to the Alleged Debtor.  (*Id.* at 3.)  At the Hearing, counsel to the Alleged Debtor confirmed that payment was not subsequently made.  Neiman Marcus is now a debtor in its own chapter 11 case.

The Alleged Debtor argues that it first learned of the disputed credit on February 24, 2020.  (Second Rodriguez Declaration ¶ 7.)  Prior to that date, Neiman Marcus never contacted the Alleged Debtor about the return of shoes relating to the Second Neiman Marcus Purchase Order and the Alleged Debtor never authorized the return of those shoes.  (MOL at 8; Rodriguez Declaration ¶ 9.)  The Alleged Debtor maintains that Wright and Affiliate never contacted the Alleged Debtor about the Unknown Dispute and that Wright and Affiliate did not have the authority to act on the Alleged Debtor's behalf or to authorize a return of the Alleged Debtor's

merchandise.  (MOL at 8*; Reply at 8.)  The Alleged Debtor claims that since Affiliate did not yet have a license to sell shoes to Neiman Marcus until January 1, 2020, it should have been obvious to Affiliate that the order related to the Alleged Debtor's order.  (MOL at 9; Rodriguez Declaration ¶ 10.)  Since the Alleged Debtor was not informed of any negotiations between Neiman Marcus and Affiliate, the Alleged Debtor did not know that Affiliate had directed the return of the Alleged Debtor's own stock or merchandise.  (Reply at 5, 9.)  Further, the Alleged Debtor believes that Affiliate authorized the return to incur favor with Neiman Marcus.  (MOL at 9; Rodriguez Declaration ¶ 11.)  Had Affiliate not interfered, the Alleged Debtor believes that Neiman Marcus would have paid the Second Neiman Marcus Purchase Order in full on or around January 2020.  (MOL at 9; Rodriguez Declaration ¶ 12.)  The Alleged Debtor asserts that it would then have had the funds to pay any valid debt to the Petitioning Creditor.

The Petitioning Creditor characterizes these events differently.  The Petitioning Creditor argues that the facts establish that Wright only authorized a stock exchange between Neiman Marcus and Affiliate, not a return of the Alleged Debtor's stock.  (Response at 10–11; Second Wright Declaration ¶ 10.)  Wright states that on or after the transition date—January 1, 2020— Affiliate contacted Neiman Marcus regarding prospective sales in preparation for transitioning its business from the Alleged Debtor.  (Wright Declaration ¶ 11.)  As part of those discussions, Wright and others representing Affiliate made clear that they represented Affiliate and no other party, including the Alleged Debtor.  (*Id.* ¶ 12.)  Neiman Marcus requested that Affiliate agree to a stock exchange whereby Neiman Marcus could exchange certain Spring 2019 Manolo Blahnik branded shoes originally sold by Alleged Debtor for a credit against Spring 2020 Manolo Blahnik branded shoes to be purchased by Neiman Marcus from Affiliate.  (*Id.* ¶ 13.)[3]  Wright

---

[3]     In the Second Wright Declaration, Wright clarifies this statement by saying that "Neiman Marcus requested that MB Americas agree to a stock exchange whereby Neiman Marcus could exchange certain Spring 2019 Manolo

states that at the time of the negotiated exchange, which led to the Second Neiman Marcus Purchase Order, the Spring 2019 Manolo Blahnik branded stock was paid for and owned by Neiman Marcus. (Second Wright Declaration ¶ 10.) Wright asserts that it was clear from his conversations with Neiman Marcus that Neiman Marcus understood that Affiliate was separate from Alleged Debtor and that a credit would be applied to future purchases by Neiman Marcus from Affiliate, not past purchases from the Alleged Debtor. (*Id.* ¶ 6.) This transaction was not a return of Alleged Debtor's stock. (*Id.* ¶ 7.) It was an exchange of stock solely by and between Affiliate and Neiman Marcus. (*Id.*) Wright did not negotiate the exchange on behalf of the Alleged Debtor. (*Id.*)

The Petitioning Creditor also argues that Neiman Marcus' non-payment to the Alleged Debtor for the Second Neiman Marcus Purchase Order was due solely to mistakes made by Neiman Marcus and/or the Alleged Debtor or confusion between Neiman Marcus and the Alleged Debtor, and was not related to the representations or actions of Affiliate. (Response at 12; McManus Declaration ¶ 24.) The Petitioning Creditor emphasizes that any such confusion was easily resolved. (Response at 12.) In fact, the March 6, 2020 email communication between Neiman Marcus and Denny Rodriguez shows that Affiliate was clear in its representations with Neiman Marcus that the exchange was not a return to the Alleged Debtor, but an exchange with Affiliate in exchange for a credit against future purchases. (*Id.*; Wright Declaration ¶¶ 21–23.) Petitioning Creditor argues that it is clear that the Alleged Debtor knew of the stock exchange because the Alleged Debtor mistakenly received the exchanged stock, advised Affiliate that it mistakenly received the exchanged stock, and made arrangements for Affiliate to pick up the exchanged stock from the Alleged Debtor. (McManus Declaration ¶ 25.)

---

Blahnik branded shoes for a credit against Spring 2020 Manolo Blahnik branded shoes to be purchased by Neiman Marcus from MB Americas." (Second Wright Declaration ¶ 5.)

In the Second Rodriguez Declaration, Denny Rodriguez rejects Wright's assertion that he knew Wright had negotiated the return of Affiliate's inventory. Denny Rodriguez states that he never opened the shipment of merchandise delivered to the Alleged Debtor's office, as he believed it was Affiliate's product. (Second Rodriguez Declaration ¶ 3.) Instead, he advised Affiliate that the Alleged Debtor had the shipment and would hold it in their basement for Affiliate to pick up. (*Id.*) Denny Rodriguez asserts that there was no way for him to know that Affiliate had negotiated a credit for itself with Alleged Debtor's merchandise. (*Id.* ¶ 5.)

### D. The Petitioning Creditor's Attempts to Secure Payment from the Alleged Debtor

While the events between Affiliate, Neiman Marcus and the Alleged Debtor were unfolding, the Petitioning Creditor asked McManus, the Parent's General Counsel, to intervene in obtaining the outstanding payment from the Alleged Debtor. (Response at 8.) McManus's responsibilities include providing support to the Petitioning Creditor as general counsel and attorney. (*Id.*) The Involuntary Petition lists McManus as "Petitioner's Representative." (MOL at 13; Involuntary Petition at 3.)

On March 10, 2020, McManus contacted Denny Rodriguez regarding the Petitioning Creditor's outstanding invoices. (MOL at 11; Rodriguez Declaration, Ex. H; McManus Declaration ¶ 20.) McManus wrote: "Please can you explain the nature of the delay in this payment. If it has already been paid, please can you send confirmation of the date of payment and account details to which the transfer was made." (Rodriguez Declaration, Ex. H.) The Alleged Debtor advised McManus that it would not make the payment until they were paid by Neiman Marcus, who was still in negotiations with Affiliate. (MOL at 11.)

Denny Rodriguez responded, explaining that "[c]urrently we have close to $800K being held by [Neiman Marcus] due to Men's RTV negotiations between [Neiman Marcus] and

12

[Affiliate].  As soon as the funds get released by NM we will release payment to Remacello."

(Rodriguez Declaration, Ex. H; McManus Declaration ¶ 21.)  On March 11, 2020, McManus

replied to Denny Rodriguez, stating:

> As you know, Calzaturificio Re Marcello is a business of its own and the supply of goods made by it to MBUSA is unrelated to any dealings MBUSA has with Neiman Marcus or Manolo Blahnik Americas LLC. MBUSA does not have a right of set-off or withholding.  MBUSA's dealings with Calzaturificio Re Marcello are not interlinked or dependent upon any other relationship. MBUSA ordered goods from Calzaturificio Re Marcello, those goods were produced and delivered and as a result the invoice is payable under both Italian law and US law. The invoice is now overdue.  Please ensure payment is processed today.

(Rodriguez Declaration, Ex. H; McManus Declaration ¶ 22.)  Denny Rodriguez did not respond

to McManus's email and did not provide the Petitioning Creditor with any additional details

regarding the ongoing dispute with Neiman Marcus or Affiliate.  (Response at 17–18; McManus

Declaration ¶ 23.)  On March 25, 2020, McManus sent Denny Rodriguez another email

informing him that she had been instructed to obtain payment through all legal channels and that

if payment was not received by March 27, 2020, then she would commence legal proceedings.

(Rodriguez Declaration ¶ 19.)  No one from Petitioning Creditor was engaged in these email

discussions.  (*See id.*)

The Alleged Debtor argues that Affiliate, Parent and Petitioning Creditor tortiously

interfered with the Alleged Debtor's contractual and business relationship with Neiman Marcus

because Parent was not a party to the Unknown Dispute and McManus was acting on behalf of

the Petitioning Creditor.  (MOL at 13.)  At the Hearing, the Alleged Debtor indicated that they

had not raised this tortious interference counterclaim with the Petitioning Creditor before the

Petition Date in an effort to maintain a positive business relationship.  However, the Alleged

Debtor's counsel stated that his firm had been retained before the Petition Date to deal with the tortious interference claim.

The Petitioning Creditor argues that the Alleged Debtor's relationship with the Petitioning Creditor was not dependent upon any relationship with Neiman Marcus or Affiliate. Rather, Petitioning Creditor is independent from Neiman Marcus and Affiliate, so the payment it is owed should not be impacted by Neiman Marcus' non-payment to the Alleged Debtor. (Response at 8.)  Additionally, the Petitioning Creditor argues that McManus' actions were taken purely on behalf of the Petitioning Creditor, since she provides legal support to Parent's subsidiaries and affiliates in her capacity as general counsel.  (*Id*. at 24.)

### E.      The Neiman Marcus Bankruptcy

On May 7, 2020, Neiman Marcus filed for chapter 11 bankruptcy protection.  (Response at 13–14.)  Even though the Alleged Debtor believes Neiman Marcus owes them $790,740.75, the Alleged Debtor is not listed as a creditor in the Neiman Marcus bankruptcy filings.  (MOL at 13.)  Affiliate is listed as a creditor in the amount of $1,041,835.75.  (Response at 14.)

### F.      Alleged Debtor's Nonpayment of Debts as They Become Due

The Petitioning Creditor filed the Involuntary Petition because, it contends, the Alleged Debtor is not paying its debts as they come due.  (*See generally* Involuntary Petition.) Petitioning Creditor asserts that two other factories which sold goods to the Alleged Debtor have not been regularly and timely paid.  (Response at 14; McManus Declaration ¶ 31.)  On March 27, 2020, Parent inadvertently received a past-due collection demand meant solely for the Alleged Debtor from Computer Generated Solutions, Inc.  (Response at 14; McManus Declaration ¶ 31.) Parent communicated this information to the Petitioning Creditor, but the Petitioning Creditor does not have any additional information about past due amounts.  (Response at 14; McManus

Declaration ¶ 32.)  The Petitioning Creditor argues that, regardless of the Alleged Debtor's other creditors, the bankruptcy court is the appropriate forum for settling the Alleged Debtor's financial affairs.  (Response at 14; McManus Declaration ¶ 33.)  Accordingly, the Petitioning Creditor believes the Alleged Debtor's assets and liabilities should be administered in a chapter 7 case before this Court.  (Response at 5.)

## II.    <u>LEGAL STANDARD</u>

Section 303(b)(1) of the Bankruptcy Code provides, in pertinent part:

> An involuntary case . . . is commenced . . . . (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or *the subject of a bona fide dispute as to liability or amount* . . .

11 U.S.C. § 303(b)(1) (emphasis added).  "A creditor must satisfy both prongs of this test; the claim must not be subject to a bona fide dispute as to *either* liability *or* a dispute as to amount." *In re Aminian*, No. 07-12957 (AJG), 2008 Bankr. LEXIS 903, at *5 (Bankr. S.D.N.Y. Mar. 25, 2008).

The Second Circuit in *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228 (2d Cir. 2015), held that courts must apply an objective standard to determine whether a bona fide dispute exists.  The court stated:

> A court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.  There is a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts. . . .  The petitioning creditor bears the initial burden of coming forward with evidence to establish a prima facie case that no bona fide dispute exists.  Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute.

*Id*. at 234 (internal quotation marks and citations omitted).  And once the bankruptcy court determines that there is a bona fide dispute, it is not the proper forum to resolve it.  *Id.* ("An

involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt. . . .  Critically, while a court is called upon to determine the presence of a bona fide dispute, it is not called on to resolve such dispute.")

The Petitioning Creditor's Involuntary Petition raises two legal issues.  The first is whether a dispute as to a portion of a petitioning creditor's claim strips the creditor of its standing to file the involuntary petition.  The second is whether an alleged debtor's counterclaims are sufficient to render the petitioning creditor's claim the subject of a bona fide dispute.

### A.    Whether a Dispute as to a Portion of the Petitioning Creditor's Claims Strips the Petitioning Creditor of Standing

Judge Bernstein noted in *In re Euro-Am. Lodging Corp.*, that:

> The phrase "as to liability or amount" was added to § 303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 [the "BAPTCA"]. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, §§ 1234(a)(1)(A) and (a)(12), 119 Stat. 23 (April 20, 2005).  Prior to the amendment, a dispute limited to the amount was not a "bona fide dispute" as to the entire claim, at least under § 303(b)(1). . . .

357 B.R. 700, 712 n.8 (Bankr. S.D.N.Y. 2007).  Following BAPCPA, "courts have been evenly split whether 'a dispute as to any portion of a claim, even if some dollar amount would be left undisputed, means there is a bona fide dispute as to the amount of the claim.'"  *Dep't of Revenue v. Blixseth*, 942 F.3d 1179, 1185 (9th Cir. 2019) (quoting *Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1, 9 (1st Cir. 2016)).

On the one hand, some courts—including the First, Fifth and Ninth Circuits—hold that "a bona fide dispute as to any amount of a petitioning creditor's claim strips the creditor of standing under § 303(b)(1)."  *Id.*; *see also Fustolo*, 816 F.3d at 10; *Credit Union Liquidity Servs., LLC v.*

*Green Hills Dev. Co., LLC (In re Green Hills Dev. Co., LLC)*, 741 F.3d 651, 657, 660 (5th Cir. 2014). The basis for that conclusion is the plain meaning of section 303(b)(1), which "encompasses disputes as to 'liability or amount' and requires that 'such noncontingent, undisputed claims aggregate' the threshold amount." *Blixseth*, 942 F.3d at 1185 (quoting 11 U.S.C. § 303(b)(1)). "Because a dispute as to liability in a sense renders the entire amount of the claim disputed, the statute's reference to 'amount' encompasses a dispute as to less than the entire amount." *Id.* Notwithstanding these holdings, if the petitioning creditor and the alleged debtor have engaged in multiple transactions, a petitioning creditor may be permitted to rely on an undisputed claim where it arises from a separate transaction between the same parties. *See Fustolo*, 816 F.3d at 11.

Other bankruptcy courts hold that the BAPCPA merely confirmed that only a material dispute as to amount will strip a creditor of standing. *Blixseth*, 942 F.3d at 1185; *see also In re Gen. Aeronautics Corp.*, 594 B.R. 442, 655 (Bankr. D. Utah 2018); *In re DemirCo Holdings Inc.*, Case No. 06-70122, 2006 Bankr. LEXIS 1131 (Bankr. C.D. Ill. June 9, 2006); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 626–27 (Bankr. N.D. Okla. 2005). These cases conclude that a bona fide dispute as to amount is not relevant unless it could reduce the petitioning creditor's total claim below the statutory threshold. *See In re EM Equip., LLC*, 504 B.R. 8, 16 (Bankr. D. Conn. 2013) (citing *In re DemirCo Holdings Inc.*, 2006 Bankr. LEXIS 1131, at *3).

The Second Circuit has not resolved that issue, but because the Alleged Debtor's liability here arises from two separate transactions—one disputed and one not disputed—it is unnecessary to the outcome here to resolve the issue whether any dispute as to the amount of a single claim disqualifies the creditor from being a petitioning creditor.

**B.      Whether Counterclaims Can Render a Petitioning Creditor's Claim the Subject of a Bona Fide Dispute**

In this case, the Alleged Debtor contends it has a counterclaim against the Petitioning Creditor, its Parent and Affiliate, for interference with contract and business relations between the Alleged Debtor and Neiman Marcus arising from the *second* 2019 transaction for which the Alleged Debtor has not been paid by Neiman Marcus.  But "a dispute as to the amount of a claim is not a *bona fide* dispute if it is based on a counterclaim arising from a wholly separate transaction."  *In re Hentges*, 350 B.R. 586, 601 (Bankr. N.D. Okla. 2006); *see also In re Mylotte, et al.*, No. 07–11861bif, 2007 WL 2033812, at *7 (Bankr. E.D. Pa. July 12, 2007) (finding that alleged debtor's pending counterclaim based on a transaction unrelated to the petitioning creditor's claim did not render the petitioning creditor's claim the subject of a bona fide dispute).  For example, "a defense to a claim in the form of recoupment goes to the heart of the claim and results in a bona fide dispute of the claim.  But a defense to a claim in the form of an independent counterclaim does not in any manner challenge the original claim and so does not place the original claim in bona fide dispute."  *In re Int'l Oil Trading Co., LLC*, 545 B.R. 336, 349–50 (Bankr. S.D. Fla. 2016) (internal quotation marks and citations omitted).

However, "where a claim for offset arises out of the same transaction and is directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense to that claim, a bona fide dispute exists."  *Key Mechanical Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 120 (2d Cir.2003), *abrogated on other grounds by Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156 (2d Cir. 2010).[4]  Thus, "[a] counterclaim related to the subject matter of the

---

[4]      *Zarnel* overruled *BDC 56 LLC* to the extent that it construed the requirement that a petitioning creditor's claim not be subject to a bona fide dispute as a prerequisite to subject matter jurisdiction.  *BDC 56 LLC* otherwise remains good authority.  *See In re Taub*, 439 B.R. 261, 273 n.2 (Bankr. E.D.N.Y. 2010).

petitioning creditors' claims may be considered by the bankruptcy court in determining whether there is a bona fide dispute as to the petitioning creditors' claims." *In re Quinto & Wilks, P.C.*, 531 B.R. 594, 605 (Bankr. E.D. Va. 2015). In *In re Honolulu Affordable Hous. Partners, LLC*, the court held that "if the facts that give rise to a counterclaim also create an affirmative defense (*i.e.*, impossibility of performance, offset/setoff, recoupment, etc.), the claim is subject to a bona fide dispute." Case No. 15-00146, 2015 WL 2203473, at *5 (D. Haw. May 7, 2015); *see also In re Green Hills Dev. Co., LLC*, 741 F.3d at 657–59 (overturning the bankruptcy court and finding that a counterclaim was sufficient to render a claim subject to a bona fide dispute since the counterclaims directly affected the amount owed to the creditor).

## III.    DISCUSSION

The Petitioning Creditor's claim in the total amount of €949,567.00 stems from two unpaid invoices in 2019 related to its manufacture of Manolo Blahnik branded shoes. Petitioning Creditor manufactured the requested Manolo Blahnik shoes and shipped them to the Alleged Debtor to fulfill two separate Neiman Marcus purchase orders. The Court finds that there are no disputed issues of material fact regarding liability or amount for the Petitioning Creditor's claim in the amount of €546,386.00 relating to the First Neiman Marcus Purchase Order. The Alleged Debtor's tortious interference counterclaim relates to the Second Neiman Marcus Purchase Order; it raises material issues of disputed fact that make the Petitioning Creditor's claim for the unpaid second transaction, in the amount of €403,181.00, the subject of a bona fide dispute. The Court concludes that the Petitioning Creditor's undisputed claim in the amount of €546,386.00 for the first transaction makes the Petitioning Creditor eligible to file the Involuntary Petition. Any counterclaims or disputed issues of material fact relate only to the Second Neiman Marcus Purchase Order that arose from a separate transaction.

19

### A.    A Portion of the Petitioning Creditor's Claim in the Amount of €546,386.00 Is Not the Subject of a Bona Fide Dispute

The Petitioning Creditor has established a prima facie case with respect to the Alleged Debtor's liability in the amount of €546,386.00 for an order of shoes that was billed to the Alleged Debtor in September and November 2019.  *See In re TPG Troy, LLC*, 793 F.3d at 234 ("The petitioning creditor bears the initial burden of coming forward with evidence to establish a prima facie case that no bona fide dispute exists.").  In that regard, Petitioning Creditor attached the unpaid invoices from September and November 2019, in the amount of €104.00 and €546,282.00, respectively, evidencing the Alleged Debtor's liability and non-payment.  (Antonia Declaration, Ex. A.)  This amount has been past-due and owing since February 29, 2020. (Response at 7.)

The Alleged Debtor did not dispute the liability or amount of the Petitioning Creditor's claim for €546,386.00.  Those invoices relate to shoes that Alleged Debtor ordered from Petitioning Creditor to fulfil the First Neiman Marcus Purchase Order in the amount of $721,893.00.  (MOL at 7; Rodriguez Declaration ¶ 5.)  The shoes were shipped to Neiman Marcus around November through December 2019.  (Rodriguez Declaration ¶ 5.)  The Rodriguez Declaration explains that on January 9, 2020, after approved deductions, Neiman Marcus paid the Alleged Debtor $601,741.90[5] for the First Neiman Marcus Purchase Order. (MOL at 7; Rodriguez Declaration ¶ 5.)  The Alleged Debtor's counterclaims for tortious interference—which form the basis for its argument that the Petitioning Creditor's claim is the subject of a bona fide dispute—do not relate to any action taken by the Petitioning Creditor with respect to the First Neiman Marcus Purchase Order.  Thus, the Alleged Debtor withheld payment

---

[5]    This is $294.30 more than the Petitioning Creditor's claim, as listed on the Involuntary Petition.

to the Petitioning Creditor in the amount of €546,386.00, even though Alleged Debtor confirmed Neiman Marcus paid them for First Neiman Marcus Purchase Order.

### B. The Petitioning Creditor's Claim in the Amount of €403,181.00 Is the Subject of a Bona Fide Dispute[6]

The Court finds that the Petitioning Creditor has established a prima facie case with respect to the Alleged Debtor's liability in the amount of €403,181.00 for an order of shoes that was billed to the Alleged Debtor in December 2019.  In that regard, Petitioning Creditor attached the unpaid invoices from December 2019, in the amount of €403,181.00, evidencing the Alleged Debtor's liability and non-payment.  (Antonia Declaration, Ex. B.)  This amount has been past-due and owing since March 31, 2020.  (Response at 9.)  The Alleged Debtor ordered those shoes to fulfil the Second Neiman Marcus Purchase Order in the amount of $790,740.75.  (*Id.*)

"Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute."  *In re TPG Troy, LLC*, 793 F.3d at 234.  The Alleged Debtor has met its burden to show that a bona fide dispute exists with respect to a portion of the Petitioning Creditor's claim in the amount of €403,181.00.  The Alleged Debtor argues that the Petitioning Creditor's claim is the subject of a bona fide dispute because the Alleged Debtor has meritorious counterclaims against the Petitioning Creditor for tortious interference with contract and business relationship on the Second Neiman Marcus Purchase Order, preventing the Alleged Debtor from paying the Petitioning Creditor's debt.[7]  (MOL at 18–

---

[6]  While the Court concludes that the claim arising from the second unpaid invoice raises disputed issues of fact because of the alleged counterclaim, and therefore may not be asserted as the basis for an involuntary petition, in the event that an order for relief is entered, the Petitioning Creditor may file a claim based on the disputed transaction and the debtor may assert its counterclaim.  The Court may, if necessary, resolve issues about the claim and counterclaim.  *See Katchen v. Landy*, 382 U.S. 323 (1966).

[7]  The Alleged Debtor also argues that it has affirmative defenses for culpable conduct which render the Petitioning Creditor's claim the subject of a bona fide dispute.  (Reply 9–11.)  In response, the Petitioning Creditor argues that the culpable conduct affirmative defense does not apply and is not valid.  (Sur-Reply at 2.)  The Court declines to rule on whether the Alleged Debtor's affirmative defense for culpable conduct can apply here because

19.)  The Alleged Debtor's counterclaim for tortious interference raises genuine issues of material fact regarding the Alleged Debtor's liability on Petitioning Creditor's claim relating to the Second Neiman Marcus Purchase Order.  The tortious interference counterclaim is sufficiently related to the Petitioning Creditor's debt, making that portion of the Petitioning Creditor's total claim the subject of a bona fide dispute.

1.      Alleged Debtor's Tortious Interference Counterclaim Raises Genuine Issues of Material Fact About the Alleged Debtor's Liability for the Second Unpaid Invoice

The Alleged Debtor has demonstrated that, objectively viewed, there are sufficient disputed issues of material fact with respect to its counterclaim that Petitioning Creditor tortiously interfered with the Second Neiman Marcus Purchase Order.  To prevail on a claim for tortious interference with contract, a plaintiff must show: (1) the existence of a valid contract between it and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach; and (5) damages resulting therefrom.  *See In re Bernard L. Madoff Inv. Secs., LLC*, 440 B.R. 282, 294 (Bankr. S.D.N.Y. 2010) (citing *Kirch v. Liberty Media Corp*., 449 F.3d 388, 401 (2d Cir. 2006)); *see also Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018).  Where there is an existing, enforceable contract and a party's deliberate interference results in breach of that contract, then the non-breaching party may recover damages for tortious interference with contractual relations even if the third party was engaged in lawful behavior.  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc*., 87 N.Y.2d 614, 621 (1996).

Here, the issue is whether Affiliate unjustifiably and intentionally procured Neiman Marcus's breach of the contract with Alleged Debtor relating to the Second Neiman Marcus

---

the Alleged Debtor's counterclaim for tortious interference is sufficient in and of itself to make a portion of the Petitioning Creditor's claim the subject of a bona fide dispute.

Purchase Order and whether those actions are attributable to the Petitioning Creditor. (Response at 19.) While the Court will not rule on the merits of the tortious interference counterclaim, the Alleged Debtor's Motion to Dismiss and the Rodriguez Declaration demonstrate that a material factual dispute exists on this point. (Rodriguez Declaration ¶¶ 7–12.) There are sufficient facts in the record to support the conclusion that Wright, an employee of Affiliate and/or Parent, caused Neiman Marcus to breach the Second Neiman Marcus Purchase Order by returning the *Alleged Debtor's merchandise* in exchange for a credit without the Alleged Debtor's approval. (*Id.*) In Rodriguez's view, the Petitioning Creditor did not have a right to negotiate any agreement that pertained to merchandise that the Alleged Debtor sent to Neiman Marcus; only the Alleged Debtor could do so. (Second Rodriguez Declaration ¶ 6.) Rodriguez states that Wright took such actions because Affiliate did not have a license to sell shoes with Neiman Marcus at the time and wanted to incur favor with Neiman Marcus to establish a positive relationship with Neiman Marcus as they began to work together. (Rodriguez Declaration ¶¶ 11–12.)

The Petitioning Creditor vigorously disputes these factual assertions. The Wright Declaration explains that Neiman Marcus requested that Affiliate agree to a stock exchange whereby Neiman Marcus could exchange certain Spring 2019 Manolo Blahnik branded shoes originally sold by Alleged Debtor in exchange for a credit against Spring 2020 Manolo Blahnik branded shoes to be purchased by Neiman Marcus from Affiliate. (Wright Declaration ¶ 13; Second Wright Declaration ¶ 5.) Wright states that it was not a return of stock to Alleged Debtor, but an exchange of stock solely by and between Affiliate and Neiman Marcus because the Spring 2019 Manolo branded stock was paid for and owned by Neiman Marcus. (Second Wright Declaration ¶¶ 7, 10.) Affiliate received and processed the exchanged stock and

internally accounted a credit of $34,154.40 in favor of Neiman Marcus relating to the exchanged items. (Wright Declaration ¶¶ 14–20.) Wright states that Neiman Marcus understood that Affiliate was separate from the Alleged Debtor and that the credit would only be applied to future purchases by Neiman Marcus from Affiliate, not past purchases from Alleged Debtor.[8] (*Id.* ¶ 14; Second Wright Declaration ¶ 6.) The Petitioning Creditor even claims that the Alleged Debtor had knowledge of the stock exchange because they accepted the merchandise from Neiman Marcus. (McManus Declaration ¶ 25.) The Court finds that the Alleged Debtor's and Petitioning Creditor's competing narratives create a material factual dispute concerning whether Wright negotiated a stock exchange of the Alleged Debtor's merchandise, whether he had the authority to do so, and whether Wright took these actions knowing that a breach of the Alleged Debtor's contract would result.

The Alleged Debtor's Motion to Dismiss and the Rodriguez Declaration also raise factual questions regarding whether Affiliate's and Parent's conduct to interfere with the Neiman Marcus contract can be imputed to the Petitioning Creditor under either agency principles or on an alter ego theory of liability. The Alleged Debtor provides evidentiary support for its claim that Affiliate, Parent, and the Petitioning Creditor operate as interrelated companies. (Rodriguez Declaration ¶ 22, Exs. A–F.) The Alleged Debtor cites to McManus's role as Global General Counsel for Parent and its subsidiaries and affiliates, including the Petitioning Creditor. (McManus Declaration ¶ 17; MOL at 24.) Alleged Debtor relies on McManus's email communications with Denny Rodriguez to show that she acted on behalf of Petitioning Creditor by pressuring Alleged Debtor to pay Petitioning Creditor. (Rodriguez Declaration ¶ 19, Ex. H;

---

[8]    Wright is not competent to testify about what Neiman Marcus "understood."

MOL at 21.)  Alleged Debtor also highlights that McManus signed the Involuntary Petition as "Petitioner's Representative."  (Involuntary Petition at 3.)

In response, the McManus Declaration provides that Parent, Affiliate, and the Petitioning Creditor transact business separately, maintain separate financial records and that the Petitioning Creditor and Parent deal at arm's-length.  (McManus Declaration ¶¶ 6–9; Second McManus Declaration ¶ 6.)

The Court concludes that the Alleged Debtor has established that disputed issues of material facts exist regarding whether Wright's and McManus' actions, as employees of Parent and Affiliate, implicate the Petitioning Creditor due to the intertwined nature of the companies. The foregoing demonstrates that there are issues of material fact with respect to the Alleged Debtor's counterclaim for tortious interference on the transaction relating to the Second Neiman Marcus Purchase Order.

2.    The Tortious Interference Counterclaim Is Related to Petitioning Creditor's Claim

The Petitioning Creditor's claim and the Alleged Debtor's counterclaim for tortious interference on the Second Neiman Marcus Purchase Order are interrelated because they arise from the same underlying transaction.  Due to the Alleged Debtor's inability to get paid by Neiman Marcus for the Second Neiman Marcus Purchase Order, the Alleged Debtor asserts that it could not pay one of the Petitioning Creditor's outstanding invoices in the amount of €403,181.00.  The Alleged Debtor even informed the Petitioning Creditor by email that "as soon as the funds get released by NM we will release payment to Remarcello."  (Rodriguez Declaration, Ex. H.)  The Court concludes that the Alleged Debtor's counterclaim based on Petitioning Creditor's alleged actions to interfere with the Second Neiman Marcus Purchase Order arises from the same transaction as the Petitioning Creditor's claim for €403,181.00 based

on the Second Neiman Marcus Purchase Order; and it is related to the subject matter of the

Petitioning Creditor's claim.  Accordingly, the Petitioning Creditors' claim in the amount of

€403,181.00 is the subject of a bona fide dispute.  *See In re Quinto & Wilks, P.C.*, 531 B.R. at

605.

The Petitioning Creditor relies on *In re Elsa Design, Ltd.*, 155 B.R. 859, 868–69 (Bankr.

S.D.N.Y 1993), and *In re Drexler*, 56 B.R. 960, 969 (Bankr. S.D.N.Y. 1986), to argue that the

existence of a counterclaim—even if it has merit—does not render a petitioning creditor's claim

the subject of a bona fide dispute.  (Response at 16.)  This reliance is misplaced.  The Petitioning

Creditor rests its argument on holdings in those cases providing that "debtor's assertion of

counterclaims, even if of substance, does not render a petitioner's claim subject to a bona fide

dispute."  (Response at 19 (quoting *In re Drexler*, 56 B.R. at 969).)  However, *Drexler* found that

an offsetting counterclaim could be used to extinguish or set off a petitioning creditor's claim.

*See Drexler*, 56 B.R. at 969.  Several courts since *Drexler* have held that a counterclaim related

to the creditor's underlying claim can create a bona fide dispute as to the amount of the claim.

*See, e.g.*, *In re Green Hills Dev. Co., LLC*, 741 F.3d at 656–57; *In re BDC 56 LLC*, 330 F.3d at

658.  As discussed above, the Court finds that the tortious interference counterclaim arises from

the same underlying transaction as the Petitioning Creditor's claim and raises material issues of

fact, rendering it the subject of a bona fide dispute.  *Drexler* does not change that result.

*In re Elsa Design, Ltd.*, 155 B.R. at 868–69, is also unpersuasive.  There, the alleged

debtor's landlord brought an involuntary petition against the alleged debtor for failure to pay

rent.  The alleged debtor did not deny non-payment but raised a counterclaim that payment was

not due because of an oral agreement which allowed the alleged debtor to withhold rent.  The

court found that the alleged debtor's counterclaim did not give rise to a bona fide dispute.  An

oral agreement is not effective as a basis for a counterclaim.  The agreement must be in writing

and signed by both parties.  Here, unlike in *Elsa Design*, the Alleged Debtor's tortious

interference counterclaim arises from written email communications.  As discussed above, in this

case the Alleged Debtor's counterclaim, objectively viewed, is sufficiently related to a portion of

the Petitioning Creditor's claim and raises disputed issues of material fact.

### C.    The Disputed Issues of Fact With Respect to the Second Neiman Marcus Purchase Order Do Not Render the Petitioning Creditor Ineligible To File The Involuntary Petition

The disputed portion of the Petitioning Creditor's claim in the amount of €403,181.00

does not strip the Petitioning Creditor of its standing to file the Involuntary Petition.  This is

because its claim in the amount of €546,386.00—arising from a separate transaction—is not in

dispute.  The First Circuit's decision in *Fustolo*, 816 F.3d 1, held that a creditor is eligible to be a

petitioning creditor if it has an undisputed claim for one transaction even though the creditor has

another claim that is subject to dispute as to liability or amount.

In *Fustolo*, the court considered a petitioning creditor's claims against the alleged debtor

arising out of four separate promissory notes.  The obligor was a non-debtor entity; the alleged

debtor personally guaranteed two of the notes but did not guarantee the other two notes.  The

creditor obtained a state court judgment against Fustolo for the amount of all four notes, even

though the alleged debtor only guaranteed two of the notes.  Fustolo appealed the state court

judgment, particularly with respect to the judgment finding him personally liable for the two

notes he did not guarantee.  The court of appeals concluded that the alleged debtor's liability for

the two notes he did not guarantee was the subject of a bona fide dispute because of a pending

state court appeal.  816 F.3d at 3.

The petitioning creditor argued that it was an eligible creditor under section 303(b)(1)

because the dispute over the state court judgment "concerns only a portion of the judgment. [Alleged Debtor] makes no real effort to deny that he owes, at least, the principal due under the Guaranteed Notes, which totals $1.25 million." *Id.* at 9.  The First Circuit rejected the petitioning creditor's argument that a materiality requirement should be read into section 303(b)(1).  *See id.* at 10 ("Limiting petitioning creditors to only those claims that are of undisputed value is in line with those aims.").  But the court held that the petitioning creditor could rely on an undisputed component of its claim that underlies a disputed multi-part judgment because "the amount of that undisputed claim is clearly severable from the amount of the total judgment." *Id.* at 11.  This is the case, according to the First Circuit, even where the involuntary petition asserted a claim for the entirety of the state court judgment.

Just as the First Circuit severed the disputed and undisputed portions of petitioning creditor's claim to determine the petitioning creditor's standing under section 303(b)(1), the Petitioning Creditor's claim in the amount of €949,547.00 is also severable because it arises from two separate transactions.  The undisputed portion of the Petitioning Creditor's claim in the amount of €546,386.00 on the First Neiman Marcus Purchase Order gives the Petitioning Creditor standing to file the Involuntary Petition.  The disputed issues relating to the tortious interference counterclaims on the Second Neiman Marcus Purchase Order arise from a separate transaction and do not render the Petitioning Creditor ineligible to file the Involuntary Petition.

The Court's decision is not in conflict with other bankruptcy courts that have taken the position that any bona fide dispute as to a portion of the alleged debt creates a bona fide dispute. *See In re Euro-American Lodging Corp.*, 357 B.R. at 712 n. 8; *In re Mountain Dairies*, 372 B.R. 623, 631 (Bankr. S.D.N.Y. 2007).  Those cases did not involve a claim that could be severed because the disputed and undisputed portions of the claim arose from separate transactions.  But

dicta in *Euro-American Lodging Corp.*, 357 B.R. at 712 n. 8, and *Mountain Dairies*, 372 B.R. at

634, both decided before the First Circuit decision in *Fustolo*, support the conclusion that

undisputed liability from separate transactions makes a petitioning creditor eligible to file or join

an involuntary petition.[9]

### D.    Other Grounds for Dismissal

The Alleged Debtor argues that dismissal is appropriate under section 303(h) of the

Bankruptcy Code because the Petitioning Creditor has provided no information regarding the

number and amount of other creditors' claims, and the Alleged Debtor's overall financial affairs.

(MOL at 26.)  By contrast, the Petitioning Creditor argues that its claim for €949,567.10 is

sufficient in and of itself to find that the Alleged Debtor is not paying its debts as they become

due.  (Response at 26.)

An order for relief against the Alleged Debtor will be entered unless the petition is timely

controverted.  11 U.S.C. § 303(h).  If the petition is controverted, relief can be granted only if,

after trial, "the debtor is generally not paying such debtor's debts as such debts become due

unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. §

303(h)(1). "The petitioning creditors have the burden of proving . . . that the debtor is *generally*

not paying its bills on time."  *In re A&J Quality Diamonds, Inc.*, 377 B.R. 460, 463 (Bankr.

S.D.N.Y. 2007) (emphasis in original).  Once this burden is met, the burden shifts to the debtor

---

[9]    *See In re Euro-Am. Lodging Corp.*, 357 B.R. at 700 n.8 (quoting *In re Focus Media, Inc.,* 378 F.3d 916,
926 (9th Cir.2004), which explained that "a dispute as to the amount of the claim gives rise to a bona fide dispute
*only when (1) it does not arise from a wholly separate transaction and* (2) netting out the claims of the debtors could
take the petitioning creditors below the amount threshold of § 303") (emphasis added; internal quotation marks
omitted); *Mountain Dairies*, 372 B.R. at 634 (discussing and quoting *Euro-Am. Lodging Corp.*, 357 B.R. at 700 n.8,
as "stating in dicta that the result of the BAPCPA amendment is that 'any dispute regarding the amount that arises
from the same transaction and is directly related to the underlying claim should render the claim subject to a *bona
fide* dispute'").

to show that there is a dispute as to a material fact, such as the existence of the liability or its amount. *See id.* Courts consider several factors in determining whether an alleged debtor is not paying its debts: the number of debts, the amount of the delinquency, the materiality of nonpayment, and the nature and conduct of the debtor's business. *See* COLLIER ON BANKRUPTCY ¶ 303.31 (16th ed. 2020). "The failure to pay just one significant creditor can support a finding that the debtor is generally not paying its debts." *In re Euro-American Lodging Corp.*, 357 B.R. at 713. If the Alleged Debtor disputes whether it is paying its debts as they become due, or with respect to the number of its creditors, the Petitioning Creditor will be permitted to take expedited discovery in advance of trial of the disputed factual issues.

## IV.    CONCLUSION

For the reasons explained above, the Motion to Dismiss is **DENIED.** The Alleged Debtor is ordered to answer the Involuntary Petition within 21 days from the entry of this Opinion and Order. The Alleged Debtor's answer must comply with Bankruptcy Rule 1003(b). Once the Alleged Debtor's answer has been filed, the Court will hold a case management conference to schedule discovery and trial as may be necessary.

**IT IS SO ORDERED.**

Dated:  August 18, 2020
     New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge